IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
_____

RACHAEL DOMINGUEZ,

        Plaintiff,

v.                                                                                                   No. CIV 03-1426 BB/LAM

UNITED STATES OF AMERICA,

        Defendant.

MEMORANDUM OPINION
AND
ORDER GRANTING MOTION TO DISMISS

THIS MATTER is before the Court on *Defendant's Motion to Dismiss Pursuant to FED. R. CIV. P. 12(b)* (Doc. #31), and the Court having considered the briefs of counsel and being otherwise advised, finds the present record supports the motion and it will be GRANTED.

*Standard of Review*

In deciding a motion to dismiss pursuant to FED. R. CIV. P. 12(b), the Court should accept all well-pleaded allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Dill v. City of Edmond*, 155 F.3d 1193, 1201 (10th Cir. 1998). A Rule 12(b) motion should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *David v. City & County of Denver*, 101 F.3d 1344, 1352

**(10th Cir. 1996) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The Court will evaluate Plaintiff's claims against this standard.**

### *Undisputed Facts*

**Dr. Jefferson Cartwright performed a medial collateral ligament and posteromedial corner reconstruction on Rachael Dominguez's right knee on September 16, 1999, at Martin Army Community Hospital at Fort Benning, Georgia. The reconstruction included the placement of screws in the tibia. Dr. Cartwright removed the hardware from the right knee of Plaintiff without complication on April 17, 2000. At that time there was no indication of any infection. On May 8, 2000, Dr. Cartwright performed an incision, irrigation and drainage of the right knee in response to signs of infection of the right knee. He prescribed antibiotics. In July, Dr. Cartwright entered a diagnosis of osteomyelitis and again prescribed antibiotics. Further surgery to treat the osteomyelitis was performed in August 2000. Following the diagnosis of osteomyelitis and prior to his leaving the Army in December 2000, Dr. Cartwright had numerous conversations with Plaintiff regarding the infection.**

**Dr. Cartwright's diagnosis of osteomyelitis was reconfirmed at the William Beaumont Army Medical Center in El Paso, Texas, in February 2001. Plaintiff filed her administrative claim at Beaumont on June 6, 2003.**

*Discussion*

There is no dispute that Plaintiff was told she had a bone infection, osteomyelitis, in the summer of 2000. However, there is a definite dispute as to when Dr. Cartwright first told Plaintiff contaminated instruments had been a problem at the Martin Hospital in Georgia and that may have been the source of infection. Plaintiff avers:

> I did not know nor was I told by anyone of the problems with osteomyelitis and surgery which occurred from dirty instruments at Martin Army Community Hospital until I talked to Dr. Cartwright in March 2003. Dr. Cartwright was out of the Army and in Harlingen, Texas. I found him when I was unable to get anyone to treat my knee.

Pl.'s Exh. F. Defendant would "impeach" this affidavit with Dr. Cartwright's deposition that he told Plaintiff that dirty instruments were a possible cause before he left the Army in December 2000 and would further bolster this with an affidavit from Plaintiff's ex-spouse.[1]

Rule 12 is an appropriate vehicle to raise a statute of limitations defense only when the complaint shows it has not been timely filed. *Dobbs v. Missouri Pac. R. Co.*, 416 F. Supp. 5 (E.D. Okla. 1975). If the defense requires the resolution of disputed facts, Rule 12 is not the appropriate vehicle. *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1042 (10th Cir. 1980); *Joslin v. Grossman*, 107 F. Supp. 2d 150, 157 (D. Conn. 2000). Therefore, a motion to dismiss does not allow a statute of limitations to be

---

[1] Plaintiff in turn submits a later and contradictory phone message from Dr. Cartwright and a second affidavit from Plaintiff's ex-spouse. In light of the Court's position that Rule 12 is not the vehicle to properly resolve conflicts of fact, the Court will not resolve the issue.

3

resolved on conflicting factual affidavits. *Competitive Associates, Inc. v. Fantastic Fudge, Inc.*, 58 F.R.D. 121 (S.D.N.Y. 1973). However, since Plaintiff could introduce testimony to support her version of the facts, the Court must accept those as true. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997); *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1266 (10th Cir. 1989).

Accepting Plaintiff's statement as true, then, she knew the surgical site became infected by July 2000 but did not suspect the cause of the infection was medical negligence until 2003. The issue then becomes whether the statute of limitations runs from discovery of the harm or the date Plaintiff determines medical malpractice is a likely cause.

Defendant correctly notes the general rule is that a tort claim accrues at the time of the plaintiff's injury. *Dahl v. United States*, 319 F.3d 1226, 1229 (10th Cir. 2003). In the area of medical malpractice, however, the federal courts have applied the "discovery rule." This means that the statute of limitations in the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2401(b), bars claims two years after the time the plaintiff knows of the existence and the basic cause of her injury. *United States v. Kubrick*, 444 U.S. 111 (1979). Once the plaintiff knows of her injury and its cause, she is obligated to investigate whether Government negligence is a possible source. *Id.*, 444 U.S. at 123-4.

The *Kubrick* Court dealt with a factual scenario not unlike that at bar. Plaintiff Kubrick was admitted to the Veterans' Administration Hospital for an infection of his

4

right femur in April 1968. The area was irrigated with neomycin until it cleared. Six weeks later, Kubrick noted a ringing and loss of hearing in his ears. In January 1969, a physician said this could have been caused by the neomycin. The district court and court of appeals both held the two-year statute of limitations was not triggered until Kubrick was told such treatment might have been negligent. The Supreme Court reversed and held that once the plaintiff knew neomycin was a likely cause of his injury, it was his duty to determine whether malpractice was involved within two years of that time. Speaking for the Court, Justice White acknowledged the district court finding that malpractice was the cause of plaintiff's harm but noted:

> Crediting this finding, as we must, Kubrick need only have made inquiry among doctors with average training and experience in such matters to have discovered that he probably had a good cause of action. The difficulty is that it does not appear that Kubrick ever made any inquiry, although meanwhile he had consulted several specialists about his loss of hearing and had been in possession of all the facts about the cause of his injury since January 1969. Furthermore, there is no reason to doubt that Dr. Soma, who in 1971 volunteered his opinion that Kubrick's treatment had been improper, would have had the same opinion had the plaintiff sought his judgment in 1969.
>
> We thus cannot hold that Congress intended that "accrual" of a claim must await awareness by the plaintiff that his injury was negligently inflicted. A plaintiff such as Kubrick, armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community. To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims against the Government.

444 U.S. at 111-12.

The Supreme Court recently reaffirmed the plaintiff's duty to investigate once the injury and its basic cause are known. In *Rotella v. Wood*, 528 U.S. 549 (2000), the plaintiff alleged the defendant physician and others conspired to keep him in a private psychiatric hospital to maximize their profits. The case was filed under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), but the Court adopted the traditional malpractice rule of injury and discovery referencing *Kubrick*:

> And it is true as well that a pattern of predicate acts may well be complex, concealed, or fraudulent. But identifying professional negligence may also be a matter of real complexity, and its discovery is not required before the statute starts running. *Kubrick, supra*, at 122, 124. Although we said that the potential malpractice plaintiff "need only ask" if he has been wronged by a doctor, considerable enquiry and investigation may be necessary before he can make a responsible judgment about the actionability of the unsuccessful treatment he received. The fact, then, that a considerable effort may be required before a RICO plaintiff can tell whether a pattern of racketeering is demonstrable does not place him in a significantly different position from the malpractice victim.

528 U.S. at 556.

The Tenth Circuit has been especially vigorous in applying the *Kubrick* rule. In *Gustavson v. United States*, 655 F.2d 1034 (10th Cir. 1981), the district court granted summary judgment on the ground the statute of limitations barred plaintiff's claim. The Tenth Circuit framed the issue as follows:

> On appeal Newcomb's representative seeks to avoid application of the limitations statute on the grounds that he reasonably failed to draw a causal link between his injury and some of the negligent diagnoses by

**military doctors until within two years of the date of filing, and that the limitation period did not commence until his damages were susceptible of ascertainment.**

**655 F.2d at 1035.**

**Affirming the summary judgment, the Court of Appeals opined:**

**Whether doctors who treated him had been negligent in not discovering his condition and recommending surgery relates to <u>the question of knowledge of malpractice, a matter irrelevant to the running of the statute of limitations</u>. Thus, regardless of whether we characterize this suit as involving multiple causes of action or a single cause of action, the statute of limitations began to run in 1973 as to any claim Newcomb had. <u>Once Newcomb was armed with the knowledge of his injury and its cause, the burden was upon him</u> to ascertain in what instances his condition should have been recognized. The facts in this case reinforce the opinion in *Kubrick* that this burden is not unduly onerous.**

**655 F.2d at 1037 (emphasis added).**

**In *Robbins v. United States*, 624 F.2d 971, 973(10th Cir. 1980), the Tenth Circuit held that a plaintiff's minority does not toll the statute of limitations and once plaintiff knows of his condition and its cause, the statute commences to run.**

**The Tenth Circuit applied the two-year bar to strike a most sympathetic claim in *Arvayo v. United States*, 766 F.2d 1416 (10th Cir. 1985). In that case, Tina Arvayo brought her five-month-old, Jose Jr., to the McConnell Air Force Base Hospital, on January 30, 1979, where he was examined by Dr. De Poe. The physician diagnosed an upper respiratory infection and sent them home with Triaminic. By the next morning the child was much worse and Mrs. Arvayo returned to McConnell. The baby was diagnosed with spinal meningitis and transferred to a civilian hospital. As a result of the**

7

**meningitis, the baby suffered significant brain damage.  Two years later, the Arvayos were dissatisfied with the Government insurance coverage of the child's medical expenses and sought legal advice.  The attorney told the Arvayos there might be a connection between the delayed diagnosis and the child's retardation.  Twenty-eight months following Dr. De Poe's misdiagnosis, a malpractice suit was filed.  The district court entered judgment in favor of the plaintiffs.  The Tenth Circuit reversed holding that once injury is apparent, "the potential plaintiff already has the duty to inquire as to both 'causation' and 'negligence' in light of our holding in *Gustavson*."  766 F.2d 1421.  The Court then applied the discovery rule to these facts:**

> **The question is simply whether a reasonable person in the Arvayos' position, with the knowledge of two drastically different diagnoses in a twenty-four hour period, with the concomitant likelihood of brain damage, would have made *some* type of inquiry.  We must hold that under these circumstances it was unreasonable for the Arvayos to make no inquiries whatsoever.  ...  The Arvayos' contention that a cause of action does not accrue under the FTCA in a failure to diagnose, treat, or warn case until they are aware – informed – of a possible connection between a misdiagnosis and an injury could possibly toll the statute indefinitely.  We conclude that such a construction would be an unwarranted, unintended extension of the meaning of the word "accrues" as it is used in § 2401(b).**

**766 F.2d at 1422.**

**Based on both Supreme Court and Tenth Circuit precedent, the Court must reluctantly conclude the present Plaintiff had a duty to make inquiry as to the possible**

source of her infection[2] and whether it might have arisen from medical negligence.  As in *Kubrick*, Dr. Cartwright's opinion regarding dirty instruments would presumably have been the same in August 2000 as it was when he eventually told Plaintiff such contamination may have caused her osteomyelitis.

### O R D E R

For the afore stated reasons, Defendant's motion must be GRANTED.

DATED this 7th day of December, 2004.

BRUCE D. BLACK
United States District Judge

For Plaintiff:
   Anthony F. Avallone, Las Cruces, NM
   Walter L. Boyaki, MIRANDA & BOYAKI, El Paso, TX
For Defendant:
   David C. Iglesias, United States Attorney, Virgil H. Lewis II, Assistant United States Attorney, Albuquerque, NM

---

[2]   Infection following surgery can result from several sources. *See Weidman v. Wilkie*, 660 N.E.2d 157 (Ill. App. 1995); David Polin, *Hospital-Acquired Infections*, 43 Am. Jur. P.O.F.2d 109 § 7 (1993) ("Most surgical wound infections are caused by organisms residing in or on the patient's own body (endogenous sources), but infections can be transmitted by operating room personnel or contaminated objects (exogenous sources).")